UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
RIGROUP LLC and JANNA BULLOCK,                              :
                                                            :   No. 12 CV 3721 (JMF)
                 Plaintiffs,                      :
                                                            :   ECF CASE
    -against-                                              :
                                                            :
TREFONISCO MANAGEMENT LIMITED,                              :   **DECLARATION OF PLAINTIFF JANNA**
CONFLICT.NET.RU (a/k/a LIMITED                              :   **BULLOCK IN OPPOSITION TO**
LIABILITY COMPANY                                           :   **MOTION TO DISMISS BY DEFENDANTS**
KONFLIKT.NET.RU), ALEXANDER ESIN,                           :   **GORSOAN LIMITED AND SIROTKIN**
A.V. BELOV, GORSOAN LIMITED,                                :
VITALY SIROTKIN, and JOHN DOES 1-7,                         :
                                                            :
                 Defendants.                      :
                                                            :
------------------------------------------------------------X

       I, JANNA BULLOCK, declare under penalties of perjury under the laws of the United States of America that the following is true and correct:

       1.     I am a named Plaintiff in this action, and also the sole member of Plaintiff RIGroup LLC (hereinafter "RIGroup USA"). I have personal knowledge of the matters set forth herein, and respectfully submit this declaration in opposition to the motion to dismiss filed by Defendants Gorsoan Limited ("Gorsoan") and Vitaly Sirotkin.

       2.     Defendants Gorsoan and Sirotkin wrongly attempt to characterize Plaintiffs' claims against them in this action as merely a "retaliation" and purported response to claims made against Plaintiffs in an action now pending in Cyprus. But that is not the case. Rather, the Cypriot action was filed after this action was commenced and in retaliation thereto. Defendants Gorsoan and Sirotkin disregard the detailed allegations of their wrongdoing in the Second Amended Complaint (the "Complaint") concerning

their wrongdoing and participation in an organized conspiracy and joint venture with Defendants Esin and Belov to further their corporate theft and wrongful conversion of Plaintiffs' assets. This Court can properly exercise jurisdiction over Defendants Gorsoan and Sirotkin (who have acted in New York via their co-conspirators) because the Complaint more than adequately alleges with particularity the nature of their actionable conduct. Since this Court is a proper forum for the litigation of Plaintiffs' claims (and Cyprus fails to provide an adequate alternative or convenient forum), Defendants' motion to dismiss should be denied in its entirety.

**For the Reasons Previously Submitted to the Court, the Russian Courts Are Not An Adequate or Available Alternate Forum**

3. I am a naturalized American citizen, residing in New York, New York. At all times relevant to the claims asserted in this action, I was both a resident and citizen of the United States.

4. For many years, via numerous companies that I own or control (directly or indirectly), I have engaged the business of real property development and investment in various locations throughout the world. Many of these development projects, both commercial and residential, have been groundbreaking and award-winning. In the United States, I continue to be the owner and sole member of Plaintiff RIGroup LLC ("RIGroup USA"), a Delaware limited liability company and real property development company with holdings worldwide. Until the conspiratorial and wrongful acts described further herein, I was the lawful and legitimate majority shareholder (via a number of corporate entities) of OOO RIGroup ("RIGroup Russia").

5. I began real estate development projects in Russia in 1998 (such projects came to fall under RIGroup Russia in 2004). At that time, I was married to Alexei

Kuznetsov, who served as the Minister of Finance of the Moscow Region until his resignation in 2008 (although my husband similarly had no role as an officer or director of RIGroup Russia, as is generally the case in Russia, business operations (including real property development) can only be successfully maintained with high-level political backing). Shortly after my husband's resignation (and, thus, at a time the company lacked the requisite political support in Russia), and at a time when I was traveling outside of Russia, RIGroup Russia (which, as evidenced by its public corporate filings, had significant and lucrative corporate assets) came under attack by well-organized and "experienced" corporate raiders, including the named Defendants herein. As I later became aware, these raiders viewed RIGroup Russia as an even more perfect target for a corporate raid because it was connected to an American entrepreneur as its majority shareholder (and, thus, even more susceptible to attack given lingering animosities that exist between Russia and the United States, and given that the corporate raid would also constitute a direct attack against me).

6. As alleged in the Complaint, these raiders, acting without authorization – but with forged documents and the requisite high-level political backing of others – purported to effect an August 2008 company-initiated "buyout" in which I (or the companies I controlled) agreed to accept shares of an affiliated company, Open Joint Stock Company Rosweb ("Rosweb") in exchange for my shares of RIGroup Russia. See generally Exhibit 1 (Adamidou Affidavit filed in Cyprus action in support of raiders' position) at ¶¶ 17 and 19(a)-(h) (falsely representing that as of 28 August 2008 "Mrs. Bullock – (as well as the Companies controlled by her) - ceased to have any interest or

affiliation with [RIGroup Russia]," and similarly misrepresenting that "Later on [RIGroup Russia] sold its shares it purchased to third persons or investors.").

7. The raiders' claim that I "sold" my controlling interest in RIGroup Russia is demonstrably false. In fact, RIGroup Russia filed a document with the Russian Register of Legal Entities representing and disclosing that as of 15 September 2009 – *i.e.* well after the alleged August 2008 company "buyout" – the companies I owned remained shareholders of RIGroup Russia. The filing similarly establishes beyond any doubt that no corporate "buyout" had occurred in August 2008 as claimed by the raiders. A true and correct copy of relevant excerpts of RIGroup Russia's 15 September 2009 corporate disclosure is attached hereto in its original Russian language together with an English-language translation as Exhibit 2.

8. As specifically set forth in RIGroup Russia's corporate filing, as of 15 September 2009 the shares of RIGroup Russia were held as follows:

| **SHAREHOLDER** | **SHARES** | **%** |
|---|---|---|
| Hotrast Consulting Ltd | 2,618,288,200 | 32.4% |
| Nogion Holdings Ltd | 2,518,764,800 | 31.2% |
| Trivalent Advisors S.A. | 2,048,787,000 | 25.3% |
| Vinilio Consulting Ltd | 462,297,000 | 5.7% |
| RIGroupUSA | 298,863,000 | 3.7% |
| Westbury Fund Ltd | 135,000,000 | 1.7% |

See Exhibit 2 (RIGroup Russia's 15 September 2009 corporate filing) at 2-3.

9. Of the companies listed as shareholders of RIGroup Russia, I am and was the rightful owner of Hotrast Consulting Ltd. ("Hotrast"), Nogion Holdings Ltd. ("Nogion"), Vinilio Consulting Ltd. ("Vinilio") RIGroup USA, and the Westbury Fund Ltd ("Westbury Fund).

4

10.   Notwithstanding the foregoing and the fact that no corporate "buyout" or had in fact taken place (and no consideration ever having been paid in any event), the corporate raiders' wrongful acts culminated in the theft (on paper) of RIGroup Russia itself by the purported transfer of 98% of RIGroup Russia's shares to Amytal Holdings Ltd. ("Amytal"), a Cypriot entity purportedly established on 26 July 2008 for the sole purpose of accepting the proceeds of the theft.  See Exhibit 3 (a true and correct copy of relevant excerpts of RIGroup Russia's 25 February 2010 corporate filing disclosing that Amytal had purportedly acquired approximately 98% of RIGroup Russia's shares) at 2. Notably, later news reports stated that I purportedly "gifted" my shares to RIGroup Russia's management – which at that time was Defendant Esin (as Director General) and Defendant Belov (as CFO).  Defendant Gorsoan, like Amytal, is merely a newly established Cypriot shell company which is being used to cloak the Defendants' raiding activities.

11.   Like those others who have faced the theft of their companies in Russia (discussed further below), I was devastated by the raiders' theft.  However, the raiders also set in motion a series of purported criminal investigations of both my husband and me, initiated litigation against other companies I own (both in Cyprus and in France), and initiated an Internet smear campaign against me (alleging, among other things that my husband and I were American spies, that my husband transferred $20 billion to companies controlled by the United States CIA, and that I was responsible for the killing of wild mustangs in order to collect their hides for art purposes).  These various disparaging articles were later attributed back to Defendant Esin and his co-conspirators.

12. Moreover, I have been repeatedly cautioned and threatened (including death threats) not to return to Russia to fight these corporate raiders. I respectfully submit that there is real substance behind these threats against my personal safety. By way of example only, my husband retained legal counsel to represent him in connection with a number of baseless criminal investigations that were initiated at the time of the alleged corporate raid and other thefts. Tragically however, my husband's counsel (with whom Defendant Esin was personally acquainted) was shot and murdered on the steps of the prosecutor's office in Moscow. While Defendant Esin's motion blandly asserts that this matter could be litigated in a normal fashion in Russia, in fact Esin is well aware of the organized criminal aspects of the corporate raiding in which he has been engaged against me and which bar any realistic possibility of fair and impartial justice in Russia for this case. See Exhibit 4 (e-mail from Esin to Stuart Sundlun, dated February 12, 2012, stating that "… in some cases when trying to return the funds or assets to RIG[roup] the bandits appeared with a large criminal record"); see also Exhibit _ (testimony of Dmitry Demidov in regard to Russian Case No. 134670, dated 3 March 2009, wherein Demidov recanted his prior testimony, stating that such prior testimony "was caused by the fact that the text of my testimony had been provided to me under threat of physical coercion").

13. The raiders' acts, including the commencement of purported criminal investigations against me, deprive me of any real ability to challenge their theft in Russia. And with no barriers in place to bar their looting, the raiders liquidated RIGroup Russia's assets and then forced the company into bankruptcy, which the raiders apparently

purchased – undoubtedly for pennies – the fraudulent debt that they themselves created. See, e.g., Exhibit 5 (RIGroup Russia bankruptcy liquidation docket).

**Further Background of Russian Corporate Raiding**

14.     Corporate raiding (in Russian, "reiderstvo") and the theft of assets has had a long history in Russia and is commonplace. See generally Exhibit 6 (Time Magazine article dated 19 Dec. 2009 entitled The Danger of Doing Business in Russia) (describing the Russian corporate raid upon the investment firm Hermitage Capital, estimating that thousands of such corporate raids occur in Russia each year, and explaining that "reiderstvo, or 'raiding,' [is] a term that describes an array of illegal tactics – including identity theft, forgery, bribery and physical intimidation – used by corrupt policemen, tax officials, lawyers and financiers to seize a person's business or property"); Exhibit 7 (Spiegel article dated 6 June 2008 entitled A Culture of Lawlessness: Russia's Raiders) (Some 8,000 companies a year are targets of lawsuits or investigations at the behest of rivals seeking to put them out of business or take them over, the Russian Chamber of Commerce & Industry says.  Russians call this process reiderstvo, or raiding."); Exhibit 8 (Center for International Private Enterprise, Evolving Corruption: hostile Takeovers, Corporate Raiding; and Company Capture in Russia, by Alexander Settles, PhD., August 31, 2009); Exhibit 9 (Wharton School of the University of Pennsylvania, Hostile Takeovers: Russian Style, dated April 20, 2009) (describing corporate raid upon the Yukos Oil, and noting that "[a]ccording to some estimates, approximately 70,000 Russian companies a year become targets of raider attacks"); Exhibit10 (American University's Kogod School of Business, Russia's Corrupt Free Market) ("[M]ore than 20 years after the fall of the Soviet Union, intimidation and corruption against business owners is rampant. Media reports estimate that up to 70,000 cases of corporate raiding – reiderstvo

7

in Russian – occur each year."); Exhibit 11 (The Washington Post, 'Raiding' Underlines Russian Legal Dysfunction, by Philip P. Pan, August 13, 2009) ("No crime illustrates the state of the [Russian] legal system better than what is known as 'reiderstvo,' or raiding – the takeover of businesses through court rulings and other ostensibly legal means with the help of crooked judges or police.").

15.  To the extent that it is relevant here, such corporate raiding activities include (as here) the wrongful use of criminal investigations against the legitimate business owners as a means to quash any resistance to the raid and to provide time for the raiders to complete their theft. See Exhibit 12 (U.S.A. Magnitsky Act) at 18 (noting that the raid of the Russian affiliate of an United States company, Hermitage Capital Management, included the wrongful criminal arrest, detention, abuse and death of Hermitage's lawyer Sergei Magnitsky: "The Human Rights Council concluded that Sergei Magnitsky's arrest and detention was illegal"); Exhibit 6 (Time Magazine article dated 19 Dec. 2009 entitled The Danger of Doing Business in Russia) (discussing Magnitsky's wrongful arrest and death; noting that "[the Russian prison] Butyrka is teeming with entrepreneurs locked up on phony charges brought against them in raider attacks"); Exhibit 7 (Spiegel article dated 6 June 2008 entitled A Culture of Lawlessness: Russia's Raiders) ("Companies are paying public officials to raid the offices of business rivals and subject them to criminal investigations. [...] Getting police to open a criminal investigation costs $20,000 to $50,000 ...."); Exhibit 8 (Center for International Private Enterprise, Evolving Corruption: hostile Takeovers, Corporate Raiding; and Company Capture in Russia, by Alexander Settles, PhD., August 31, 2009) at 3 ("They [raiders] may also utilize law enforcement agencies to open an investigation to seize key company

documents, which can later be falsified to transfer ownership to the raider;" "Evroset's owner and chairman ... was also interrogated in relation to a series of criminal cases filed against the firm and its top managers by the General Prosecutor's Office Investigations Committee in 2008."); Exhibit 10 (American University's Kogod School of Business, Russia's Corrupt Free Market) (noting that "One in six Russian businessmen has been prosecuted for an alleged economic crime over the past decade ..." and documenting the story of Evgeniy Konovalov – "Though the charges [against him] were fabricated – it was eventually proved in court that forged documents were used to purchase his firm – he spent a year under arrest."); Exhibit 11 (The Washington Post, 'Raiding' Underlines Russian Legal Dysfunction, by Philip P. Pan, August 13, 2009) ("The practice [of corporate raiding] is so widespread that the local media have reported what raiders charge: ... $50,000 to open a criminal case, $300,000 for a court order.").

16.   These trumped up and fictitious criminal proceedings and politically-driven persecution brought against me in Russia (to cover for the corporate raid of RIGroup Russia) are classic examples of what the governments of both Russia and the United States have declared to be illegal practices and in violation of one's human rights. See Exhibits 13-14 (discussing Russia's "Corporate Raiding Law," Fed. Law No. 147-FZ); Exhibit 12 (U.S. "Magnitsky Rule of Law Accountability Act of 2012") (United States Congressional findings that such corporate raiding activities in Russia, including improper criminal investigations as to the actual victims of such raiding activities, is "emblematic of a broader pattern of disregard for the numerous domestic and international human rights commitments of the Russian Federation and impunity for those who violate basic human rights and freedoms," and "evoke serious concerns about

the right to a fair trial and the independence of the judiciary in the Russian Federation"); see also Exhibit 15 (relevant excerpt: United States Department of State, Bureau of Democracy, Human Rights and Labour, Country Reports on Human Rights Practices for 2011 – Russia) at 8 ("Magnitskiy was arrested on trumped-up charges, in breach of Russian law and the European Human Rights Convention") at 14-15 ("[The ECHR] ruled that Russia violated Yukos' right to the protection of property and that Russian authorities violated provisions of the European Convention on Human Rights, including Article 6, the right to a fair trial."); Exhibit 16 (relevant excerpt: United States Department of State, Bureau of Democracy, Human Rights and Labour, Country Reports on Human Rights Practices for 2009 – Russia) at 1, 54-59 ("Rule of law and due process violations remained a problem [in Russia]. Corruption was widespread throughout the executive, legislative, and judicial branches, and officials often engaged in corrupt practices. Corruption in law enforcement remained a serious problem."); Exhibit 17 (relevant excerpt: United States Department of State, 2012 Investment Climate Statement – Russia) at 1, 3, 6-7 ("Unfortunately, corruption plays a sizeable role in the [Russian] judicial system;" "According to numerous reports, corruption in the judicial system is widespread and takes many forms, ranging from bribes of judges and prosecutors to fabrication of evidence."). Indeed, by the Magnitsky Act (Exhibit12), the United States has resolved to create a "list" of persons responsible for the detention, abuse and death of Sergei Magnitsky, and/or were responsible for the criminal conspiracy uncovered by Sergei Magnitsky. These persons would then be subject to United States visa restrictions and asset seizure. See Exhibit 12 (Magnitsky Act) at 25 (and section 404).

17. This Court should not condone the acts of the Defendants by dismissing this action as a purported "inconvenient forum," where (as here) Defendants have rendered Russia wholly unavailable to me via physical threats (including death threats) and manipulation of the criminal legal system such that I would face immediate persecution and imprisonment (in violation of my human rights and the laws of both the Russian Federation and the United states) were I ever to return to Russia to prosecute these claims.

18. Defendants are fully familiar with these criminal investigations, as Defendant Esin testified under oath against me in one such criminal investigation (and contrary to his sworn statement in this action), and Sirotkin attached that testimony as an exhibit to his affidavit filed in Cyprus in support of Gorsoan's application for an ex parte asset freezing order. See Exhibit 18 (Sirotkin Affidavit) (English translation provided by Defendant Gorsoan) at ¶¶ 43, 71.

**The Cyprus Courts Are Not An Adequate, More Convenient or Available Alternate Forum**

19. According to publicly filed documents (see Exhibit 19), Gorsoan is a corporation organized and existing under the laws of Cyprus. It was formed on March 15, 2010. The shareholder of Gorsoan is Mesoch Corporate Services Ltd. ("Mesoch"), a Cypriot corporate services company located in Nicosia, Cyprus. The shareholder of Mesoch is Doros Zavallis who is the same Doros Zavallis associated with the law firm of Michaelides & Zavallis Advocates, with offices located at the same address of Mesoch. Id.; see also Exhibit 20. Victoriya Spivak, who serves as director of Gorsoan, and who serves as a director of Mesoch together with Zavallis, is an employee of Zavallis and/or

11

Michaelides & Zavallis Advocates. Mesoch (as shareholder of Gorsoan) and Spivak (as director) are nominee shareholders and directors who are installed in those positions in order to hide the identity of the true beneficial owners of Gorsoan.

20. Gorsoan has participated in litigation before the Russian courts for a number of years and, as disclosed in various filings made in such proceedings, maintains an office in Moscow (thus establishing that various, as of yet undisclosed, parties in Russia are connected with Gorsoan and its operations). Gorsoan's bank account(s) in Cyprus have been frozen (see Exhibit 19), suggesting the Company's further impropriety.

21. Vitaly Sirotkin is a Russian citizen who is an employee of the Gazprombank. On August 20, 2012, Sirotkin filed an affidavit in support of an action filed by Gorsoan in Cyprus seeking to encumber Plaintiffs' assets. See Exhibit 18 (Sirotkin Aff.).

22. In light of the prior submissions made by Plaintiffs establishing that Russia cannot be held to be an adequate alternate forum under the circumstances presented here, it is perhaps not surprising that Sirotkin (a Russian citizen) and Gorsoan (which, has been engaged for years in legal proceedings before the Russian Courts, and has in those proceedings that it has an office in Moscow located at 115114 Derbenevskaya Embankment, No. 11, Block B, 14th floor, Moscow Russia) abandon any claim that Russia is an adequate, more convenient or available alternate forum.

23. Rather, presented with the proverbial "second bite at the apple," Defendants now claim that Russia's backyard playground – Cyprus – somehow provides an adequate alternate forum for the litigation of Plaintiffs' claims here. Defendants are wrong, and simply seek to attain a practical bar to litigation via the "backdoor."

24. Specifically, Cyprus has entered into an extradition treaty with Russia. Accordingly, if I were to ever appear in Cyprus to prosecute my claims against Defendants, I would immediately be arrested and extradited to Russia to face the very same trumped up criminal charges that render Russia an inadequate alternative forum.

25. Such a fear is not speculative or remote, as Defendants Gorsoan and Sirotkin well know. Dmitry Kotlyarenko, another party sued by Gorsoan in Cyprus, was arrested in Cyprus and extradited to Russia to face criminal charges (of which he was convicted) in similar criminal proceedings (which Dirotkin and Gorsoan attempt to emphasize as evidence of purported impropriety in Gorsoan's Cyprus action). See Exhibit 21; Exhibit 18 (Sirotkin Aff.) at ¶ 51.

**Jurisdiction Over the Defendants Is Proper**

26. On or about July 29, 2009, Defendants Esin and Belov, together with others, caused RIGroup Russia to initiate a civil action in the courts of Cyprus (hereafter, "Cyprus Action No. 1," District Court of Limassol Action No. 3423/2009) against Plaintiff RIGroup USA, among others, seeking to enforce a purported loan agreement as between RIGroup Russia and the Cypriot company Laziar Holding Ltd. ("Laziar") in the principal amount of 34,110,000 euros (the purported "Laziar Loan"). See Exhibit 1.

27. RIGroup Russia claimed in that action (contrary to Defendant Sirotikin's sworn affidavit filed in Cyprus Action No. 2, described below), that it borrowed monies from Svyaz Banks (a Russian bank) in order to satisfy its loan commitment to Laziar, and that Bullock and RIGroup USA used these borrowed funds to purchase a number of hotels in Courchevel, France (hereafter, the "French Hotels"). Id. In essence, by Cyprus

Action No. 1, Defendants Esin and Below, together with their co-conspirators, sought to wrongly and unlawfully take possession of the French Hotels.

28. RIGroup USA and its affiliated companies defended Cyprus Action No. 1 on the merits, and submitted to the court documentation establishing that (a) those purported to act on behalf of RIGroup Russia were in fact corporate raiders, having no legitimate standing to so act; and (b) that the purported Laziar Loan was a fraud, and that Plaintiffs' purchase of the French Hotels was legitimately funded by Bullock's sale of RIGrroup Russia shares (as documented in its own quarterly financial statements), and not by any after-the-fact "loan."

29. Apparently recognizing the futility of further pursuing the claims asserted in Cyprus Action No. 1, that case languished for years before the claims were ultimately dismissed with prejudice by the Court's Order of March 14, 2013.

30. By e-mail dated February 16, 2012 (attached as Exhibit 22) (*i.e.*, more than a year before Cyprus Action No. 1 would be dismissed with prejudice), Defendant Esin (through an intermediary, Stuart Sundlun, a businessman located in New York, New York) offered to sell to me (in New York, New York), at "the initial selling price – 10% of the [principal loan] amount" at least four purported RIGroup Russia "loans."

31. These so-called loans were : (a) a purported loan to Hitnell International Limited in the principal amount of USD 7.8 million (loan agreement number HT1-10-06); (b) a purported loan to Alderly Limited in the principal amount of USD 11.6 million (loan agreement number 15/03/07-01); (c) a purported loan to Campana Holding Limited in the principal amount of USD 6,297,050 (loan agreement number KP1-10-06) and (d) the Laziar Loan, in the principal amount of 34, 110,000 euros). Id.

32. Although Esin would not name the company that had purportedly purchased these loans, he represented that he was an agent of that company and claimed that lawyers for the company "asked me to represent them" in the negotiation and sale of the loans.

33. On February 21, 2012, Esin e-mailed Plaintiffs, via Sundlun, in New York, New York (attached as Exhibit 23), and forwarded large ".zip" files of documentation purportedly related to the Laziar Loan. In his covering note, Esin represented that he would have "a power of attorney to represent the interests of the Cypriot company in the recovery of RIG debts." Esin further stated that he wanted to "start" his negotiations with Plaintiffs "with the biggest debt associated with the hotels." Id.

34. On February 29, 2012, Esin again e-mailed Plaintiffs, via Sundlun, in New York (attached as Exhibit 24) (apologizing that the documentation he attached was in Russian, but explaining that the interested party – me – would be able to read them), and attached, among other documents, a February 17, 2012 contract whereby RIGroup Russia purported to assign its rights in and to the Laziar Loan to Defendant Koflikt.net (by its director, Defendant Belov) for some undisclosed amount. Esin further explained in his e-mail that: "While this is information on a company one of many. The rest of the right of claim are smaller and come to pay step by step. The total amount of the claims – more than 71 million dollars." In closing, Esin stated that: "As I said, I will be in New York in late March. I think we will have to meet." Id.

35. On March 6, 2012, Esin once more wrote to Plaintiffs, again via Sundlun, attaching a purported power of attorney granted to him by Defendant Trefonsico

15

Management Limited. By this power of attorney, Esin represented that he was an authorized agent and attorney in fact with authority to negotiate the sale of the purported RIGroup Russia loans to Bullock. Id.

36.  Plaintiffs determined that Esin and Belov's demands were extortionate and accordingly initiated this action, by summons with notice, on March 15, 2012 in the Supreme Court of the State of New York, New York County. Thereafter, on March 21, 2012, Plaintiffs personally served Esin in New York, New York. I never met with Esin during his stay in New York, nor did I ever have any appointment or plan to do so.

37.  After Esin was served in connection with this action, he engaged in further contacts in New York in connection by threatening me in an attempt to convince me to withdraw my claims against him.

38.  More specifically, on June 28, 2012, Esin e-mailed Sundlun in New York, New York (attached as Exhibit 25), stating that "Janna [Bullock] continues [her] litigation against me. [...] I don't know why she does it. There will be a big scandal that will bring nothing but harm to her." Later, Esin threatened Plaintiffs personally, via Sundlun, asserting that unless I withdrew my claims in this action against him, he and others would retaliate against me and seek to ruin me and my family.

39.  Shortly after Esin made these threats, I received anonymous death threats via the Internet. At the same time, Defendant Gorsoan commenced a second action against RIGroup USA and I, among others, in Cyprus (the "Cyprus Action No. 2;" District Court of Limassol Action No. 3573/2012) initiated by way of an ex parte motion for a global asset freeze and injunction. That ex parte application was supported by the false affidavit of Defendant Sirotkin, an employee of Gazprombank (Exhibit 18).

16

40. To this end, Gorsoan (with the aid and assistance of Sirotkin) filed Cyprus Action No. 2, and requested that the Cypriot Court enter an ex parte asset freezing order.

41. As part of their wrongful conduct, Sirotkin submitted false testimony to the Cyprus Court (via his ex parte affidavit to the Cypriot Court which expressly included documents and information "provided to Gorsoan on a confidential and anonymous basis by an individual [not identified or disclosed]." See Exhibit 18 (Sirotkin Aff.) at ¶ 4(f).

42. Sirotkin falsely testified that I had somehow fraudulently diverted assets to my own benefit (although even Sirotkin admits in his affidavit that neither I nor any entity owned by me was an issuer of (or guarantor of) any promissory note upon which Gorsoan seeks recovery, and that Sirotkin's speculation as to diverted assets is at least three steps removed from me and/or any of my companies).

43. Sirotkin also falsely testified (as explained above) that I, and various companies owned by me, somehow relinquished ownership of RIGroup Russia, and "ceased to be shareholders of [RIGroup Russia] on or about 20 August 2008." See Exhibit 18 (Sirotkin Aff.) at ¶ 77.

44. Sirotkin further falsely testified, as one example of the purported wrongful diversion of funds, as to the existence of a "loan" from RIGroup Russia to Hitnell in the principal amount of $7.8 million – such funds being used to purchase a property in London for approximately $7.4 million. Even Sirokin admits, and attaches documents to this effect (Sirotkin Affidavit at ¶¶ 253-257 and referenced exhibits 132-133), that the purchase of the subject property was funded by means of a mortgage issued from Butterfield Bank (which was subsequently satisfied), and not by any purported

17

"loan." Indeed, a mortgage from Butterfield Bank was secured to pay the purchase price of the subject property.

45.  Simarly, Sirotkin falsely testified that, as another example of the purported wrongful diversion of funds, as to the existence and purported propriety of the Laziar Loan. See Exhibit 18 ( Sirotkin Affidavit) at ¶ 261 and exhibit 135.  Indeed, Sirotkin goes so far as to attach a copy of this purported "loan."  The Laziar Loan attached to Sirotkin's affidavit (attached hereto as Exhibit 26) purports to be executed by Maria Agini on behalf of Laziar, and affixed with the Laziar corporate seal, as follows:

For Laziar Holdings Limited

За Лейзиар Холдингс Лимитед



Maria Agini

Мария Агини

Seal / м.п.

18

46. As the example below (attached as Exhibit 27) makes clear, the purported Laziar Loan proffered by Sirotkin bears a forged signature (in no way resembling the actual signature of Maria Agini) as well as a forged corporate seal:



### Gorsoan's Cypriot Action Was Filed After, And In Response to, This Action

47. This action was initiated (originally in the New York State court) on March 15, 2012 via the filing of Plaintiffs' summons with notice.

48. In the summons with notice, as well as the original complaint filed in this action on April 17, 2012, Plaintiffs listed various John Doe defendants as individuals or entities that acted in concert with the other specifically named and identified Defendants to defraud Plaintiffs and wrongfully convert Plaintiffs' assets. Plaintiffs alleged that information obtained in discovery would lead to the identification of additional co-conspirators to be named as Defendants.

49. It was not until August 3, 2012, that Gorsoan initiated Cyprus Action No. 2, and thereby revealed Gorsoan and Sirotkin as additional parties seeking to defraud Plaintiffs in collaboration with Esin and Belov. Thereafter, on August 28, 2012, Plaintiffs amended their complaint and added Gorsoan and Sirotkin as Defendants in this action.

50. Cyprus Action No. 2 was thus not the first filed action, nor is that action further progressed than these proceedings as Defendants claim. To the contrary, while Plaintiffs in this action have actually filed claims and served each of the parties, Gorsoan has yet to file any claim in Cyprus Action No. 2. Indeed, Gorsoan will not be required to file claims until pending motions are resolved by the Cyprus court, including but not limited to my motion to dismiss for lack of jurisdiction. Given the state of these proceedings, it is more than a little disingenuous for Defendants Gorsoan and Sirotkin to claim that my claims could even be asserted in Cyprus (given, among other things, jurisdictional hurdles), let alone be filed as "compulsory" counterclaims.

51. For each of the foregoing reasons, the motion to dismiss filed by Defendants Gorsoan and Sirotkin should be denied in all respects.

Dated: May 3, 2013

_____
Janna Bullock